

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1508-08

**DANNY WAYNE GRAMMER, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE TENTH COURT OF APPEALS JOHNSON COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, WOMACK, JOHNSON, KEASLER, and COCHRAN, JJ., joined. PRICE, and HOLCOMB, JJ., concurred.

## O P I N I O N

Pursuant to a plea-bargain with the State, appellant was placed on deferred-adjudication community supervision ("probation") for ten years after pleading guilty to a nine-count indictment charging him with the offenses of aggravated sexual assault (three counts) and indecency (six counts) against an eleven-year-old girl. A condition of appellant's probation required him to pay $250 in court costs within 120 days after being placed on probation, and another condition required him to "avoid association with persons having criminal records and having disreputable or harmful

character." The trial court (not the same judge who had placed appellant on probation) later found that appellant violated these two conditions and sentenced him to lengthy concurrent prison terms (60 years on the three aggravated sexual-assault counts and 20 years on the six indecency counts) immediately after adjudicating his guilt. We exercised our discretionary authority to review the Waco Court of Appeals's decision that the trial court did not have to hold "a separate punishment hearing" before sentencing appellant.[1] Finding that appellant had the opportunity to, and did, present punishment evidence at the adjudication hearing, we will affirm.

The record from the adjudication hearing reflects that appellant's lawyer indicated that he had no witnesses when the trial court asked the witnesses to come forward for purposes of invoking the rule before the hearing began.

[TRIAL COURT]: Does State have any witnesses?

[STATE]: This is the State's witness, Your Honor.

[TRIAL COURT]: Does Defense have any witnesses?

[DEFENSE]: Your Honor, we may have witnesses in terms of character witnesses[2] but none fact based as far as the violation. I don't know if you want to invoke the rule for them.

* * *

[TRIAL COURT]: The rule has been invoked so any witnesses you have that are going to testify in any part of this hearing need to come forward and be sworn in.

[DEFENSE]: We don't have any witnesses, Your Honor.

The record also reflects that appellant's ten-year probationary period began on January 6, 2006. On January 16th appellant began serving 180 days in jail as another condition of his

---

[1] *See Grammer v. State*, 268 S.W.3d 774, 779-80 (Tex.App.–Waco 2008).

[2] Appellant has made no claim that he had no opportunity to present character witnesses.

probation.[3]  While in jail serving this time, appellant began an association with Kristi Turner, who was incarcerated in the same jail.  On May 11th Turner was convicted of the state-jail-felony offenses of possession of a forged instrument and of fraudulent use or possession of identifying information and placed on probation for five years.  Turner was released from jail at about this time.

Appellant was released from jail about two months later on July 16th.  Appellant's probation officer (Friedmann) testified that appellant told her during their first meeting on July 19th that he "wanted to date a woman [Turner] who had a bad check charge."  Friedmann testified that she told appellant that he could date Turner because appellant "presented the information along the lines that [Turner] was done with her time, it was just a bad check, and there was nothing further going on with her case."  Appellant did not inform Friedmann at this time, or at any other time, that Turner was a convicted felon who was on probation.  Friedmann testified that she would consider a person to have a criminal record if that person "had a probation or had been convicted of a hot check case."  Friedmann also testified that she would not consider a person to have a criminal record if that person "had just gone to jail . . . and maybe hadn't been adjudicated guilty of anything, had just got arrested."

> Q. [STATE]: Tell the Court, if you would, when the first time you became aware of Mr. Grammer seeing this woman, Kristi Turner.
>
> A. [FRIEDMANN]: On July 19, 2006 was the first report that I took on him after he was released from jail, and he mentioned he had wanted to date a woman who had a bad check charge.
>
> Q. Okay.  Now, according to the probation papers which the Court has taken judicial

---

[3]

Appellant testified that he was given ten days (from January 6th to January 16th) "to get [his] business arrangements in order" before he was to begin serving the 180 days in jail.  The record reflects that he did not pay the $250 in court costs during this period of time.

notice of, this specific order would say you're supposed to avoid associations with persons who have criminal records and those of disreputable or harmful character; is that correct?

A. Yes, sir.

Q. Okay. Now, if somebody, as an example, if somebody had a probation or had been convicted of a hot check case, would that be a criminal record?

A. Yes, sir.

Q. Okay. If somebody had just gone to jail, for instance, and maybe hadn't been adjudicated guilty of anything, had just got arrested, would you consider that a criminal record?

A. No, sir, not if they had not been convicted.

Q. Okay. So when Mr. Grammer went in and basically told you, "Hey, I'm thinking about dating this girl or I'm dating this girl, is it okay?", what did he lead you to believe was her criminal situation?

A. He presented the information along the lines that she was done with her time, it was just a bad check, and there was nothing further going on with her case.

Q. Did he indicate to you at that time that she was a convicted felon?

A. No, sir.

Q. Did he indicate to you that she was on felony probation out of Johnson County?

A. No, sir.

Q. This would have been in [sic] July 19th of '06; is that correct?

A. That's correct, sir.

Q. Okay. All right. So he didn't say these things to you. What did you say to him about whether it was okay or not to do this?

A. I told him–that's why I further questioned him and told him, okay, if there's no further charges, there's no further anything going on with the case, then that would be fine at that time to date her.

Friedmann testified that she discovered that appellant and Turner were living together when she visited appellant's residence on August 2nd. Friedmann also learned during this home visit that Turner was a convicted felon on probation. Friedmann testified that appellant was violating his probation by living with Turner. She also testified that, in addition to not informing her that Turner was a convicted felon, appellant also did not inform her that he and Turner were living together.

Q. [STATE]: And did [appellant] indicate to you that they were going to live together or what did he indicate to you about what that meant?

A. [FRIEDMANN]: He did not indicate that they were living together. He indicated that they would be dating.

Q. All right. Let me take you to August 2nd, 2006. Was Mr. Grammer still on probation at this time?

A. Yes, sir.

Q. Okay. Did anything occur on August 2nd, 2006 that effected [sic] his probation?

A. Yes, sir.

Q. And what was that?

A. I conducted a home visit to his registered location and I discovered [Turner] was there and I discussed with her--

* * *

I saw her. She stated I had just missed him, that he had come home for lunch. And I asked her if she was on probation. She stated she was. And I asked her who her officer was, and she stated Bryan Jenkins. At that time I knew then that she was on felony probation.

* * *

Q. Did [appellant] ever tell you that he was living with her?

A. No, sir.

Q. Did you discover that on the home visit?

A. I discovered that on the day of the home visit.

* * *

Q. In fact, in this case was that a violation of his probation?

A. Yes, sir.

Friedmann testified that she told appellant on August 3rd that he could not live with Turner unless they were legally married. She also testified that appellant told her on August 3rd that he planned to marry Turner and live with her and her children, including her 12-year-old daughter.

Q. [STATE]: Did he ever indicate to you what his plans were in the future with Ms. Turner about getting married, those sorts of things?

A. [FRIEDMANN]: He indicated on August 3rd that he planned to get married to her.

Q. Okay. And did he explain to you what the family unit would look like?

A. He explained that he wanted to live with her and her children and for her to be a chaperon.

Q. I see. So she has children?

A. Yes, sir.

Q. And do you know their ages?

A. I know her daughter's age at the time of my report of violation was 12.

Q. So 12-year-old daughter; is that correct?

A. Yes, sir.

Q. Just curious. How old was the victim in this case he's on probation for?

A. 11 years old, female.

Friedmann testified that she gave appellant a deadline until the end of September 2006 to marry Turner and that she subsequently received a letter from appellant's divorce lawyer stating that appellant should be divorced from his wife by then. Based on Friedmann's report that appellant had violated his probation, appellant was arrested on August 25th. Appellant paid the $250 in court costs

that day.  He married Turner some time after this (the record does not reflect whether they were married before the end-of-September deadline though it appears to reflect that appellant's divorce became final on September 20th).

Friedmann testified that she believed that appellant was an untruthful manipulator and that he did not appear to be serious about completing his probation.

Q. [STATE]: Okay.  What kind of probationer was he generally then?

A. [FRIEDMANN]: I did not believe he was truthful.  I believed he was manipulative at my first appointment with him on July 19th.

\* \* \*

Q. Okay.  Then just generally speaking without the violations, what was his demeanor like?  Was he–did he seem serious about probation?  Did he seem like he was going to do it?

A. He did not appear serious about completing his probation.

Appellant testified on direct examination by the defense that he started associating with Turner while they were in jail.  He testified that he thought Turner was in jail for "checks" and that he did not know that Turner "was on probation until she was put on probation."

Q. [DEFENSE]: Do you recall meeting and starting a relationship with anyone while you were in jail?

A. [APPELLANT]: Yes, sir.

Q. And what was her name?

A. Kristi Turner.

Q. Okay.  Were you aware at the time that Miss–that Ms. Turner was on probation?

A. I didn't know she was on probation until she was put on probation.[4]  I knew she

---

4

This testimony would support a finding that appellant knew on May 11th that Turner was on probation.

was in jail.  I met her before she was put on probation, and then I knew she was on probation.  We only got to correspond by letters.  That's the way we correspond, and just see each other every now and then.  Yes, sir, I knew after she was on probation.

\* \* \*

Q. And what did you understand her to be in jail for?

A. Checks.  That's what she told me, checks.  I didn't dwell on–I didn't–any of that, you know, I've never been in trouble for that.  And, you know, she told me checks.  I took it as checks.  That's checks.  I don't know what.

Appellant also testified about the July 19th meeting with Friedmann.  He testified that he told Friedmann that he met Turner in jail and that they were thinking about getting married.  He testified that he told Friedmann that Turner had been in jail for "checks" but that she was "done with all that."  He seemed to claim that Friedmann led him to believe that he could associate with Turner because Turner "was done with her jail time."

Q. [DEFENSE]: Okay.  Did you have any conversation with Ms. Friedmann during the first visit about [Turner]?

A. [APPELLANT]: Yes, sir.

Q. And what was the nature of that conversation?

A. I knew I had–you know, I knew I had to tell her that I was seeing her.  And I told her I had met a girl in jail and we had talked about getting married; was that going to be a problem.

Q. And what did she tell you?

A. She told me–she asked me, said what was she in jail for.  And I told her checks.  And she said, "Is she done with all that?"  And I said, "yes, ma'am, she is."

Q. Now, let me stop you there.  When she asked you were you done with all that, what is [sic] your understanding?

A. I took it to mean that she was done with her jail time and, you know, she was out of jail.  And I told her yes.

Q. Okay.  What happened then?

A. Then she said as long as she stays out of trouble and does what she's supposed to do, I don't see a problem with it.[5]

Appellant also testified that he and Turner began living together on July 28th. He testified that he and Turner saw Turner's probation officer (Jenkins) that same day, that Turner informed Jenkins that she was living with appellant and that Jenkins did not "see a problem with it." Appellant also testified that he saw Friedmann that day (he did not answer the question whether he informed Friedmann then that he and Turner were living together).

Q. [DEFENSE]: Okay. Did you inform [Friedmann] that [Turner] was living with you?

A. [APPELLANT]: We didn't start living together until July 28th. I had talked to [Friedmann], told her that we were dating, thinking about getting married. [Turner] saw her probation officer on July 28th. She asked him, and he said, "I don't see a problem with it."[6]

Q. And were you with her that same day she went?

A. Yes, sir.

Q. Is that the same day you also saw [Friedmann]?

A. Yes, sir.[7] After that they scheduled our probation the same day so we could go the same day.

---

[5] We note that the record supports a finding that appellant knew during his first meeting with Friedmann on July 19th that Turner was a convicted felon on probation and that appellant failed to mention this to Friedmann.

[6] Jenkins testified that he believed that it was September 7th when Turner told him that she had been living with appellant.

[7] Friedmann testified that she saw appellant at the probation department with Turner some time between July 19th and August 2nd. Friedmann also testified that appellant told her that he was there with Turner without mentioning that they were living together.

Q. Did you inform [Friedmann] on your next appointment to see her?

A. I think she came to the jail to see me. I was working at the jail, you know, in the maintenance department. I think she–the next one she came to the jail and visited me, "Hey, how you doing? Everything okay?" "Yeah." And that was it. We didn't talk about anything. She just wanted to make eye contact.

Appellant also testified that he could not marry Turner until his divorce was final and that Friedmann and Turner's probation officer (Jenkins) gave them until the end of September 2006 to get married, but that he was arrested on August 25th.[8] Appellant also testified about the efforts he made, prior to his arrest on August 25th, to pay the $250 in court costs. He seemed to claim that Friedmann led him to believe that his obligation to pay these costs did not begin until his release from jail.

Q. [DEFENSE]: After getting out, I guess sometime in August [sic], you paid that 250 bucks.

A. [APPELLANT]: After I got out I started paying my probation fees. And I would always pay more than the $65 I was supposed to pay. I would pay 80, sometimes a hundred, you know. And I told Ms. Friedmann, I said, "You know, I'm paying a little more. I should be able to knock it out pretty quick." And she said, "You're paying over, that's fine." She said it's okay. And so then they arrested me, and one of my violations is I haven't paid my court costs. I hadn't been out of jail but 40 days when they arrested me, you know, and I'm working as hard as I can to get stuff paid.
* * *
Q. [STATE]: I understand, but did it say that you could pay 120 days after you got out of jail or 120 days from January?

A. [APPELLANT]: I was under the impression it was from the time I got out of jail because I couldn't make any money while I was in jail.
* * *
Q. Why were you under that impression?

---

[8]

Jenkins testified that it would have been a violation of Turner's probation for her to associate with someone (such as appellant) on probation, but that he agreed with Friedmann's end-of-September deadline for Turner to marry appellant.

A. Because when I had talked to Ms. Friedmann about my fees, I said, "Where am I on my fees? I'm paying more." She said, "That's okay. You're going to get caught up. You're going to get caught up sooner than you think." You know, four months, I had it figured in four months I would be caught up.

Q. You just testified you thought you had 120 days after you got out of jail. Where did it say that in there?

A. It doesn't say that.

Appellant testified on cross-examination that he knew that Turner was placed on probation "somewhere around" May 11th, but that he did not know that it was felony probation. Appellant seemed to admit, however, that he knew that Turner was a convicted felon before they began living together when he testified that he did not have his guns in the house when they were living together there because "she is a convicted felon."

Q. [STATE]: Okay. Did you have any of your guns in the house with you--

A. [APPELLANT]: No, sir.

Q. –when you were with Ms. Turner?

A. No, sir, not a one.

Q. Why not?

A. Because that was against her probation. She can't--

Q. Why would it be against her probation?

A. Because she is a convicted felon. Oh, let me explain something. The day I signed my plea agreement, the day I signed, I had all my guns moved.

Q. Okay.

A. Because I didn't know the rule and I wanted to be safer than sorry. I have a lot of guns, and I had all my guns moved to a friend's house in Grandview.

* * *

Q. Did you have the guns there anytime she was there?

A. No, sir.

Q. Why would that be?

A. Because it was against her probation.

Q. Because she was a convicted felon?

A. Because she's on probation. There again, I don't know the law that well. I knew she was on probation and she couldn't be around guns. I didn't know whether I could or not until I talked to Ms. Friedmann, and she told me yes, you can have your guns.

Q. Okay. But the point is you said you didn't have any of the guns because she was a convicted felon.

A. Because she was on probation.

Q. A second ago you said convicted felon. Which is it?

A. She's on probation.

Appellant also testified that he knew that he was violating his probation by associating with

Turner even if she was on probation only for hot checks.

Q. [STATE]: All right. Now, even if she's on–say she was on misdemeanor probation. Do you understand what the No. 3 of your terms and conditions of probation says?

A. [APPELLANT]: Yes, sir, I do.

Q. You cannot associate with someone with a criminal record?

A. Yes, sir.

Q. Correct?

A. Yes, sir.

Q. Even if it were a probation for hot checks, that would be a criminal record, wouldn't it?

A. Yes, sir.

* * *

Q. So whether it was felony to your knowledge at that time or not, you knew whenever you were seeing her outside of the jail, I mean, you did see her in the jail, but you knew when you started seeing her outside the jail, she was convicted of something?

A. Yes, sir.

Q. So you knew she had a conviction for a criminal record?

A. Yes, sir.

Q. And so even at that point, whether it's a felony or not, in your own mind, you've already violated probation, haven't you?

A. Yes, sir.[9]

During closing arguments to the trial court, the State argued that appellant lied to Friedmann about Turner's criminal record and that he manipulated the probation officers into allowing him to marry Turner, but that the "long and short of it is" that appellant violated his probation.

> [STATE]: It's clear by his attitude, Mr. Grammer's attitude with probation that he thinks he deserves special treatment. I can't imagine a case where a Court in Johnson County, Texas is going to give somebody who has sex with an 11 year old who is 50 years old himself special treatment. That's what he's looking for in this case. He violated two conditions of probation; one of which is the money which, you know, he had the money to pay the day after he was arrested. When it became important to him, he took care of what was on probation. That absolutely by his own admission is a violation, so he did violate probation there.
>
> More importantly is his association with Kristi Turner. He's going to have the Court believe that he had no idea. This guy has been in jail all this time. He's up on the law in his own case. He understands everything that's going on about his own felony case, and he's going to lead this Court to believe he had no idea that it was a felony. The fact of the matter is, Judge, he went in, told his probation officer a lie, that it was only for checks, no big deal, so that he could get that association going. And he did

---

[9] This testimony would, therefore, support a finding that appellant knew during his first meeting with Friedmann on July 19th that associating with, dating, and living with Turner was a violation of his probation.

that. And basically what he's done is lived with a convicted felon, which is a violation of his probation. And then tried to manipulate the officers into allowing it after the fact. And maybe out of the goodness of their hearts they tried to do that, but the long and short of it is, he violated his probation.

The State also argued that, in assessing appellant's sentence, the trial court could consider evidence that appellant was manipulating probation so that he could live "with someone with a small child."

> [STATE]: When the plan is to associate with someone who is a convicted felon and has a 12-year-old child that's going to be living in the home, it is a big deal. The argument we're going to get is it's not a big deal. But the Court can also look at the entirety of the case. And what the Court can look at, according to what is in the Court's own file, is that this man pled guilty to nine counts, three of which were aggravated sexual assault of an 11-year-old girl. The other six counts were all indecencies with an 11-year-old girl.

> The Court can consider all of that, and I think that's what the Court should do. If this is not a dangerous man, why would he be convicted of–or why would he have pled guilty to all these things? If he's not a dangerous man, somebody that needs to be out of society, why is he manipulating probation doing just whatever he plans on doing and living with and associating with someone with a small child? Why is he doing all that?

The defense argued that appellant's probation "violations" are that "he met and fell in love and eventually married someone who has a record." The defense also argued that appellant did not intentionally violate his probation and that his probation violation regarding his association with Turner was the result of an innocent misunderstanding and Friedmann's failure to ask appellant more specific questions.

> [DEFENSE]: Was he intentionally trying to violate his probation? I don't think so and I don't think the evidence that you heard on the stand suggests that.

> Was there a misunderstanding between what Ms. Friedmann may have been asking him and how he interpreted? Absolutely. Anybody could have misunderstood it because it was not a direct question.

Immediately after the parties finished their closing arguments, the trial court adjudicated

appellant's guilt on all nine counts and sentenced him. Neither appellant nor his lawyer objected that appellant was being denied "a separate punishment hearing" or that he was being denied an opportunity to present punishment evidence. Appellant later claimed in a timely filed amended motion for new trial, which the trial court denied in a written order, that the trial court denied "his right to a separate punishment hearing . . . in that the Court did not hear the initial plea and failed to conduct a presentence investigation or allow for the presentation of evidence in mitigation of punishment."[10]

Appellant claimed on direct appeal that the trial court abused its discretion in denying him "a separate punishment hearing." The court of appeals rejected this claim because "[n]othing in the record indicates that the trial court prevented [appellant] from presenting punishment evidence" and because appellant "presented [punishment] evidence before the adjudication and plainly had the opportunity to present punishment evidence then." *See Grammer*, 268 S.W.3d at 779-80. Appellant claims on discretionary review that the court of appeals "erred in overruling Appellant's challenge to the trial court's failure to hold a separate punishment hearing . . . in that the [trial] Court did not hear the initial plea and failed to conduct a presentence investigation or allow for the presentation

---

[10] Appellant made no claim in his amended motion for new trial that he had no opportunity to present character witnesses. According to appellant's amended motion for new trial, evidence that was not, but should have been, presented at the adjudication hearing was the testimony of a legal assistant (Lou Ann) to appellant's divorce lawyer. Lou Ann did not file an affidavit in support of appellant's amended motion for new trial. But, according to supporting affidavits from appellant's mother and aunt, Lou Ann would have testified that appellant could not marry Turner until his divorce was final and that appellant's and Turner's probation officers "were okay with this as long as the marriage took place by September 30th." These affidavits from appellant's mother and aunt also recite that appellant "relied on Lou Ann's representations and also the representations of the probation officers . . . that [appellant and Turner] had permission to get married and everything would be okay as long as they were married by September 30." We note that the substance of this evidence was presented at the adjudication hearing.

of evidence in mitigation of punishment."[11]

We decide that the court of appeals did not err to reject appellant's claim that the trial court abused its discretion in not holding "a separate punishment hearing." The record clearly reflects that the trial court did not prevent appellant from presenting punishment evidence and that appellant did, in fact, present extensive punishment evidence (e.g., his theory that he innocently believed that he had permission to associate with and to marry Turner and his reasons for not paying the $250 in court costs within 120 days after being placed on probation on January 6th). *See Hardeman v. State*, 1 S.W.3d 689, 691 (Tex.Cr.App. 1999) (all that is required is that a defendant have the opportunity to present evidence during the adjudication proceedings and "it is immaterial that the presentation

---

[11]

Appellant argues on discretionary review that the "problem with this case is that the facts are egregious" primarily because his probation was revoked for doing what his probation officer gave him permission to do. The court of appeals' majority opinion also seems to have accepted this defensive theory. *See Grammer*, 268 S.W.3d at 778-79 (disagreeing with trial court's decision to adjudicate appellant's guilt under the circumstances of appellant "having obtained permission to associate with and to marry Turner"); *but see Grammer*, 268 S.W.3d at 780 (Gray, J., concurring in the judgment) (asserting that court of appeals' majority opinion unjustifiably criticized the trial court's decision to adjudicate appellant's guilt). The trial court's decision to adjudicate appellant's guilt is not presented in this proceeding and has no bearing on whether the trial court abused its discretion in not holding "a separate punishment hearing."

We also do not believe that the facts of this case are egregious. We believe that the trial court could have reasonably found that appellant knew from the very beginning that associating with Turner was a violation of his probation and that he was less than honest with Friedmann about Turner's criminal record when he asked Friedmann for permission to date Turner. We disagree with any suggestion by appellant that, under such circumstances, Friedmann had a duty to ask appellant more specific questions about Turner's criminal record. Appellant had a duty of candor to Friedmann, and Friedmann had no duty to ask the questions that might have led to the discovery of appellant's lack of candor. The trial court could also have reasonably found that appellant was not serious about completing his probation, that he was intentionally violating his probation by associating with Turner, possibly to gain access to her 12-year-old daughter, and that he dishonestly manipulated the probation system to gain Friedmann's "permission" to marry Turner. Under the circumstances of this case, the trial court could reasonably have found that Friedmann's "permission" for appellant to marry Turner by September 30th did not have the effect of curing appellant's probation violation of associating with Turner.

of this evidence occurred before the actual words of adjudication"); *Pearson v. State*, 994 S.W.2d 176, 179 (Tex.Cr.App. 1999) (defendant not improperly sentenced at adjudication hearing because he not only had the opportunity to, but did present, punishment evidence); *compare Issa v. State*, 826 S.W.2d 159, 160-61 (Tex.Cr.App. 1992) (defendant preserved error in motion for new trial raising trial court's improper assessment of sentence immediately after adjudicating defendant's guilt without giving the defendant an opportunity to object or to present evidence).[12]

The judgment of the court of appeals is affirmed.


Hervey, J.


Delivered: September 30, 2009
Publish

---

[12]
We further note that appellant did not present anything new in support of his motion for new trial.